IN THE CIRCUIT COURT FOR THE FIFTEENTH JUDICIAL CIRCUIT
IN AND FOR PALM BEACH COUNTY, FLORIDA

CASE NO.:

EARTH SCIENCE TECH, INC.,
a Nevada Corporation,

        Plaintiff,

vs.

CROMOGEN BIOTECHNOLOGY
CORPORATION, a Foreign
Corporation; IMPACT UA, INC.,
a Foreign Corporation; SLAVIK
NENAYDOKH, an individual; and
MICHAEL BRUBECK, an individual,
        Defendants.

_____/



### ***COMPLAINT***

COMES NOW, the Plaintiff, EARTH SCIENCE TECH, INC., a Nevada

Corporation, with offices in the State of Florida, by and through the undersigned

counsel, and brings this its action for specific performance and damages against the

Defendants, CROMOGEN BIOTECHNOLOGY CORPORATION, a Foreign

Corporation, (hereinafter referred to as "Cromogen"),  IMPACT UA, INC., a

Foreign  Corporation,  (hereinafter  referred  to  as  "Impact"),  SLAVIK

NENAYDOKH, an individual, and MICHAEL BRUBECK, an individual, and

would state further as follows:

**Ex 1**

1. Venue is proper in Palm Beach County, Florida as the Plaintiff maintains operations in Palm Beach County, Florida and same is where the specific performance which is the subject matter of this lawsuit is to be performed. Additionally, certain unlawful activities complained of took place in Palm Beach County, Florida.

2. The Defendants are non-residents of the State of Florida but amenable to service of process herein and by and through activities described herein, had substantial contacts within the State of Florida and are thereby subject to the jurisdiction of the Circuit Court in and for the State of Florida located in Palm Beach County, Florida.

3. The Defendant, Slavik Nenaydokh, is and was at all times hereafter mentioned an officer, agent and employee of Cromogen Biotechnology Corporation bearing the title Head of Global Corporate Development at Cromogen.

4. The Defendant, Michael Brubeck, is and was at all times hereafter mentioned an officer, agent and employee of Cromogen Biotechnology Corporation bearing the title of Chief Executive Officer.

5. Cromogen entered into an agreement with the Plaintiff, a copy of which is attached hereto and made part hereof, for the sale of "CBD rich hemp oil", the latter being the non-euphoric constituent of the cannabis plant and a legally saleable food additive.

6.  The contract which is attached hereto as Exhibit "A" provided for quality, consistency, concentration and potency of "CBD" in amount between to 5% to 50% of the product sold.

7.  As part of the contract, certifications were required to accompany each batch of product shipped.

8.  Plaintiff, per contract, paid Cromogen $175,000.00.

9.  The agreement with Cromogen called for a sample to be provided to the Plaintiff prior to shipment.   Despite having been paid $175,000.00, the Defendant contrived to delay sending a sample of any kind for two and one half months.

10. When the so-called sample was finally sent, it was in a packet one inch square in size and did not contain enough product for any kind of adequate analysis.  The Defendants, knowledgeable in the science and methodology related to hemp oil, well knew that the sample would not suffice and sought to excuse it with the transparently convenient assertion that they didn't have enough because they had sent out samples to other people.

11. At a later date, upon request, the Defendant, NENAYDOKH, admitted to the CEO of Plaintiff that despite the contract calling for a range of concentration between 5% and 50%, they in actuality never had the ability to supply such product even though they had disingenuously represented that they could in order to get a contract signed and money in hand paid.

12. In addition, as a matter of further circuitousness, the Defendant, CROMOGEN, attempted to obtain payment for undelivered product on an invoice naming "Impact" as the payee, although there was nothing at any time to suggest who and what "Impact" was or how it could possibly be entitled to payment from Plaintiff. On information and belief, "Impact" may be a device used by Defendants, fraudulently, to divert payment for their own purposes.

13. As a result of the perplexing nature of the certifications, inquiry was made of the laboratory that had furnished them and the result is attached hereto, indicating that they had been baited or misled into furnishing documents not consistent with their practice or the integrity of their work. The confirmation of the foregoing is attached hereto as Exhibit "B" and made part hereof.

14. As a result of this information, the Plaintiff secured other, independent analyses of the hemp oil product Cromogen had supplied. Same are attached and, in each instance the revealed CBD content was far below what was represented originally and the minimum the contract called for. See Composite Exhibit "C".

15. On information and belief as the result of continuous dealings, exchanges, assurances, correspondence and negotiations, the parties who dealt with CW, extracted the misleading reports, re-directed them to accompany the product shipment and insisted on their accuracy in the face of overwhelming evidence to the contrary were the Defendants, Nenaydokh and Brubeck, who in fact

orchestrated and carried out a concerted scheme to defraud, with full knowledge and expectation of Plaintiff's reliance on their representations and intending by such fraud to achieve benefit.

16. Plaintiff has satisfied, waived or complied with all conditions precedent to the institution of this action.

## COUNT I – ACTION FOR SPECIFIC PERFORMANCE

17. Plaintiff, EARTH SCIENCE TECH, INC., reavers and realleges paragraphs 1 through 16 as if fully stated herein.

18. Pursuant to the terms of the contractual agreement and more specifically paragraph 21, the parties agreed to equitable remedies which, when read in the context of mutuality of remedies and relief, provides for and confirms the Plaintiff's entitlement to seek specific performance under the terms of the contract.

19. The Defendants have failed to perform timely and provide conforming goods under the terms of the agreement to date.

20. Defendants' failure to comply with the subject contract has caused the Plaintiff potential damages which are not readily ascertainable.

21. The Plaintiff is without adequate remedy at law.

22. The Plaintiff, EARTH SCIENCE TECH, INC., respectfully demands that the Defendant, CROMOGEN, and to whatever extent, IMPACT is an affiliate

or bound to the terms of the contract, perform and provide product and services in total conformity with the subject agreement.

23. The Plaintiff seeks damages ancillary to the subject specific performance to compensate for any delays associated with product delivery and further seek an award of attorney's fees and costs for the prosecution of this action.

WHEREFORE, the Plaintiff, EARTH SCIENCE TECH, INC., respectfully moves this Honorable Court for an order seeking specific performance under the terms of the contract together with such other and further relief as this Honorable Court may deem proper.

## COUNT II - ACTION FOR FRAUD

24. Plaintiff, EARTH SCIENCE TECH, INC., reavers and realleges paragraphs 1 through 16 as if herein fully stated.

25. Plaintiff contracted for the purchase of certain conforming CBD product as is specifically described in the attached agreement (Exhibit "A").

26. The Defendant, CROMAGEN, was unable to deliver such product.

27. That upon specific information and belief, the Defendants, SLAVIK NENAYDOKH and MICHAEL BRUBECK, did contact the certifier and control laboratory and undertook to cause improper information in the form of factual ingredient content and percentages to be disseminated to the Plaintiff in the hopes

that the Plaintiff would be misinformed and rely upon said misinformation to its detriment.

28. As a direct and proximate result of the Defendants/individuals' actions, ultra vires to their employment with the Defendant CROMOGEN, the Plaintiff has and continues to suffer damages.

29. The Defendants' actions were specifically and intentionally done to mislead and misinform the Plaintiff and cause the Plaintiff to rely thereon.

30. As a direct and proximate result of the Defendants' fraud the Plaintiff has been damaged in the millions of dollars by its inability to sell product of the quality and consistency contemplated by the agreement made and induced by the false representations of the Defendants.   Plaintiff was advised by Defendant Nenaydokh in this regard that "EST has retail access to $7,000,000.00 to $15,400,000.00. . . of inventory.  (Exhibit "D").   If that inventory were not misrepresented and of dubious practical utility, contemplated profits would be in excess of $4,000,000.00.

WHEREFORE, the Plaintiff, EARTH SCIENCE TECH, INC., respectfully demands judgment against the Defendants, SLAVIK NENAYDIKH and MICHAEL BRUBECK, for damages as a result of their fraudulent actions together with such other and further relief as this Honorable Court may deem proper.

## *COUNT III – FUDTPA*

31. Plaintiff, EARTH SCIENCE TECH, INC., reavers and realleges paragraphs 1 through 16 as if fully stated herein.

32. This is an action under Fl. Stat. § 501. For injunctive relief and an award of attorney's fees.

33. Plaintiff had a contractual agreement with the Defendants to provide certain products identified within the attached agreement (Exhibit "A").

34. That the Defendants failed to provide such product and undertook to misrepresent the chemical composition of the product through third parties.

35. That the actions of the Defendant, CROMOGEN, were calculated to mislead the consuming public and the Plaintiff herein.

36. That the Court has jurisdiction over the parties and the subject matter for the purposes of entering injunctive relief to prevent the Defendant, CROMOGEN, from continuing to act in the same manner and function as it has in connection with the subject transaction.

WHEREFORE, the Plaintiff, EARTH SCIENCE TECH, INC., respectfully demands judgment against the Defendants in the form of injunctive relief preventing the continued and repetitive actions of the Defendant, CROMOGEN, in the furtherance of its unfair and deceptive trade practice in addition to an award of

attorney's fees and costs for the prosecution of this action together with such other and further relief as this Honorable Court may deem proper.

### *COUNT IV – IMPACT UA, INC.*

37. Plaintiff, EARTH SCIENCE TECH, INC., reavers and realleges paragraphs 1 through 16 as if herein fully stated.

38. The Defendant, IMPACT UA, INC., is an interested party in this transaction by virtue of its having invoiced the Plaintiff for product, a copy of which invoice is attached hereto as Exhibit "E" and made a part hereof.

39. To the extent that the Defendant, IMPACT UA, INC., is or may be involved in the subject transaction, the Defendant is named herein as an interested party defendant. Defendant IMPACT would appear to have complicity and incurred liability by billing the Plaintiff for product it never owned, sold or had an interest in, actively conspiring with the individual Defendants to foist misrepresented product on the Plaintiff and/or attempting to divert, insulate and launder the proceeds of a fraudulent enterprise.

WHEREFORE, the Plaintiff, EARTH SCIENCE TECH, INC., respectfully demands such relief as is just and proper to the Defendant, IMPACT UA, INC.,

together with such other and further relief as this Honorable Court may deem proper.

/s/Steven Warm
STEVEN WARM, Esq.
Florida Bar No.: 314544
5700 S.W. 34th Street, Suite 425
Gainesville, Florida 32608
Phone:       352-373-8279
Fax:         352-373-8351
E-mail:      SW@stevenwarm.com

JOSEPH P. KLAPHOLZ, P.A.
7951 S.W. 6th Street, Suite 210
Plantation, Florida 33324-3276
Phone:  954-925-3355 ext. 135
Fax:       866-537-1210


By: /s/ Joseph P. Klapholz
 JOSEPH P. KLAPHOLZ, Esq.
 Florida Bar No.: 450431
Primary email: jklap@klapholzpa.com
Secondary email: dml@klapholzpa.com

## Distribution Agreement

This Distribution Agreement (this "**Agreement**") is made effective as of **June 5, 2014** (the "**Effective Date**") by and between **Cromogen Biotechnology Corporation.**, a corporation, having a principal place of business at Pasaje Dordelly 4414, San Salvador, El Salvador ("**Supplier**") and **Earth Science Tech, Inc.**, having a principle place of business at **40 East Main Street #998, Newark, DE 19711** ("**Distributor**").

### Background

A.  Cromogen Biotechnology is a global hemp based biotechnology company that has developed proprietary cultivation and processing capability allowing for the accessibility & democratization of cannabinoid extracts for the nutraceutical market.

B.  Distributor desires to be a distributor of proprietary CBD rich hemp oil products provided by Supplier.

C.  The parties hereby agree for Cromogen Biotechnology to grant Earth Science Tech, Inc. the right to distribute and resell CBD rich hemp oil produced by Cromogen Biotechnology under the terms and conditions of this Agreement.

### Agreement

1.  Appointment and Duties.

    1.1. Appointment as Distributor. Subject to the terms and conditions of this Agreement, Cromogen Biotechnology hereby appoints Distributor as its precise term exclusive (the "Exclusivity Term") Distributor to formulate, market, and sell CBD (Cannabidiol) rich hemp oil (the "Product") to Public Companies trading on the OTC/Pink Sheet exchanges.

    1.2. Authorized User of Exclusivity Term. The Exclusivity term assigned to Distributor is a non-transferable assignment. Therefore, if Distributor desires for additional entities, or individuals or contractors beyond the Authorized Distributor to use the Exclusivity term, Distributor must engage into a separate valued added Distributor agreement with separate terms for the new entities, individuals, and contractors proposed.

    1.3. Prohibited Activities. Distributor will not promote market, advertise, or sell the Exclusivity Term or the Services outside the ("Territory") (United States of America). If Distributor receives any purchase order from any person or entity in any region outside the Territory, Distributor will promptly refer such order to the Supplier and engage in a separate contractual agreement relating to any specific sales deal resulting from this referral. Supplier reserves the right to market, and sell CBD rich hemp oil directly to consumers and to appoint other Distributors outside the Territory.

        1.3.1. Press Releases. Distributor will not publish any press releases that include Cromogen Biotechnology as part of the publication without prior written approval from Cromogen Biotechnology. Supplier will not publish any press releases that include Earth Science Tech, Inc. as part of the publication without prior written approval from Earth Science Tech, Inc.

Page 1 of 9

CONFIDENTIAL INFORMATION OF
CROMOGEN BIOTECHNOLOGY AND EARTH SCIENCE TECH, INC.

EXHIBIT "A"

1.3.2. **Companies not covered by OTC/Pink Sheet Exchanges.** Distributor may formulate, market and sell CBD (Cannabidiol) rich hemp oil (the "Product") to Non-OTC/Pink Sheet Exchange companies however Distributor will not have an exclusivity to Non-OTC/Pink Sheet Exchange companies.

1.4. **Conflict of Interest.** Distributor and Supplier will not market, sell, or distribute any product or service that contains any CBD (Cannabidiol) rich hemp oil or otherwise competes with the Supplier or Distributor, within the confinements of the OTC/Pink Sheet exchanges. Distributor and Supplier will not engage in any action likely to cause harm to Distributor or Supplier reputations.

1.5. **Brand.** The product must be promoted, marketed, advertised, and sold under Distributor specified brands to companies operating in the OTC/Pink Sheet exchanges.

1.6. **Restrictions.** Distributor acknowledges that the production process of the CBD rich hemp oil and its logistics including the transit, source and or origin up to the point of delivery constitute trade secrets of Cromogen biotechnology. Unless required to disclose such information by any government agency or court of law the distributor agrees that it will not (i) permit any third party to access the production process of the biomass and its logistics including the transit, source and or origin up to the point of delivery. (ii) use supplier production, delivery and product to store or transmit infringing, libelous, or otherwise unlawful or tortious material, or to store or transmit material in violation of third-party privacy or confidentiality rights.

1.7. **Payment Terms & Invoicing.** Unless otherwise agreed in a Purchase Order, Product fees and expenses shall be calculated by the Supplier on a monthly basis and invoiced to Distributor within sixty (60) days after the end of each month. Payment for Purchase Orders shall be due in the following format:

1.7.1. A fifty (50) percent down payment is due fifteen (15) days from the date of invoice provided the product is verifiable by the distributor. Verifiable in this section means Supplier has title and possession of the CBD rich hemp oil, and Distributor can verify same using a bank or escrow agent or any other third party Distributor finds credible.

1.7.2. A fifty (50) percent remaining payment is deposited to an escrow account and released in the following format:

1.7.2.1. A twenty five (25) percent payment is due and released when fifty (50) percent of the deliverable cargo releases at a US destination

1.7.2.2. A twenty five (25) percent payment is due and released when remaining fifty (50) percent of the deliverable cargo releases at a US destination

1.8. **Pricing Policy.** Distributor will acquire CBD rich hemp oil from Supplier at a set price per milligram of CBD molecule for the duration of this Agreement as provided by Exhibit A.

2. Deal Sourcing, Marketing & Distribution.

2.1. **Deal Sourcing.** Distributor will use diligent efforts to source deals and vet potential customers by conducting thorough legal, financial, operational and strategic due diligence.

CONFIDENTIAL INFORMATION OF CROMOGEN BIOTECHNOLOGY AND EARTH SCIENCE TECH, INC.

disclose Confidential Information only to its employees, contractors, and agents who need to know such information for purposes of this Agreement and shall contractually require such employees, contractors and agents to comply with the obligations of confidentiality.

3.4. Expiration of Duty.  Recipient's duty to hold Confidential Information in confidence expires five (5) years after this Agreement terminates.

3.5. Terms of the Agreement.  The terms and conditions of this Agreement will be considered Confidential Information of both parties, provided that either party may disclose the terms and conditions of this Agreement to its professional advisor under a duty of confidentiality or a third party in connection with actual or potential financing or sale of all or substantially all of the party's business and assets related to this Agreement, whether through merger, sale of assets, sale of stock, or otherwise.

4.   Fees & Forecast.

4.1. Fees.  Supplier and Distributor will share the revenue generated from Distributor's sale of the product as provided in Exhibit A (the "Revenue Share").  Distributor will pay Supplier the Revenue Share on a monthly basis according to the payment terms provided in Exhibit A and the Payment Terms & Invoice section.

4.2. Customer Pipeline & Revenue Share Report.  Distributor will provide to Supplier on a monthly basis, within thirty (30) days after the end of each month, a written report on customers being engaged by the Distributor and sales of Product made during the prior month, including the name of the Customer, the total volume of CBD rich hemp oil sold, the description of customer and product application, and such other information relating to the sale and Customers as may be reasonably requested by Supplier.

4.3. Resale. Distributor may re-sell the Product at whatever price and other terms and conditions of sale Distributor deems advisable, provided that the Revenue Share payable to Supplier may be no less than the minimum amount provided in Exhibit A.

5.   Term.  The term of this Agreement will be for 12 months beginning on the Effective Date ("Initial Term") of May 12th, 2014 and ending on May 12th, 2015.  This agreement and specifically the exclusivity aspect will be reviewed December 31st, 2014, based on the commitment of Distributor to secure purchase orders from Supplier for the year 2014 as stipulated in Exhibit A.  This agreement may be renewed for an additional 1 year and up to 5 years should both parties agree to do so.

6.   Termination for Cause. This Agreement may be terminated, prior to the expiration of the then-current Term, by either party effective immediately upon written notice if: (a) the other party materially breaches any provision in this Agreement which remains uncured within five (5) days after written notice of such breach is given by the aggrieved party to the breaching party; or (b) if (i) a voluntary petition in bankruptcy shall be filed by the other party, or (ii) an involuntary petition in bankruptcy or petition alleging insolvency or inability to pay debts when due in the ordinary course of business shall be filed against the other party and not be dismissed within thirty (30) days, or (iii) a receiver shall be appointed for the assets of the other party and not be dismissed within thirty (30) days, or (iv) the party shall make an assignment for the benefit of creditors, shall become insolvent, or shall be unable to pay its debts when due in the ordinary course of business.

7.   Survival.  Upon termination or expiration of this Agreement, Sections 1.4, 1.5, 2.4, 3 and any outstanding payment obligation shall survive.



**CONFIDENTIAL INFORMATION OF**
CROMOGEN BIOTECHNOLOGY AND EARTH SCIENCE TECH, INC.

8. **Warranty.**

8.1. Each party represents and warrants that it has full right, power, and authority to enter into this Agreement and to perform its obligations and duties under this Agreement, and that the performance of such obligations and duties does not and will not conflict with or result in a breach of any other agreements of such party or any judgment, order, or decree by which such party is bound.

8.2. Distributor shall be responsible for all Customer complaints and warranty claims for the Product. Distributor will not make any representation, warranty, or guarantee concerning Products on behalf of Cromogen Biotechnology

9. **Disclaimer.** EXCEPT AS EXPRESSLY PROVIDED HEREIN, (I) CROMOGEN BIOTECHNOLOGY MAKES NO OTHER WARRANTY, EXPRESSED OR IMPLIED, WITH RESPECT TO THE PRODUCTS, OTHER SERVICES PROVIDED HEREUNDER, INCLUDING QUALITY, RELIABILITY, OR ACCURACY, (II) EXCEPT AS OTHERWISE PROVIDED HEREIN, CROMOGEN BIOTECHNOLOGY AND ITS SUPPLIERS DO NOT WARRANT, GUARANTEE, OR MAKE ANY REPRESENTATIONS REGARDING THE USE, PERFORMANCE, OR THE RESULTS OF THE USE, OF THE PRODUCT, OTHER SERVICES RELATED TO THE PRODUCT IN TERMS OF CORRECTNESS, ACCURACY, RELIABILITY, OR OTHERWISE. NO ORAL OR WRITTEN ADVICE OR INFORMATION PROVIDED BY CROMOGEN BIOTECHNOLOGY OR ITS SUPPLIERS SHALL CREATE A WARRANTY, AND Distributor IS NOT ENTITLED TO RELY ON ANY SUCH ADVICE OR INFORMATION. THIS DISCLAIMER OF WARRANTIES IS AN ESSENTIAL CONDITION OF THIS AGREEMENT.

10. **Limitation of Liability.** IN NO EVENT SHALL CROMOGEN BIOTECHNOLOGY OR ANY OF ITS SUPPLIERS BE LIABLE FOR COSTS OF PROCURING SUBSTITUTE PRODUCT, NOR FOR ANY LOSS OF BUSINESS, INTERRUPTION OF BUSINESS, LOST PROFITS OR GOODWILL, OR OTHER INDIRECT, INCIDENTAL, EXEMPLARY, PUNITIVE, OR CONSEQUENTIAL DAMAGES OF ANY KIND ARISING OUT OF OR RELATED TO THIS AGREEMENT, REGARDLESS OF WHETHER THE CLAIM IS BASED ON BREACH OF CONTRACT, TORT LIABILITY OR OTHERWISE. IN NO EVENT WILL THE TOTAL CUMULATIVE LIABILITY OF CROMOGEN BIOTECHNOLOGY UNDER THIS AGREEMENT EXCEED THE TOTAL AMOUNT PAID TO CROMOGEN BIOTECHNOLOGY UNDER THIS AGREEMENT FOR THE PRODUCT OR THE SERVICES AFFECTED BY THE CLAIM DURING THE TWELVE (12) MONTH PERIOD PRECEDING THE EVENT WHICH GAVE RISE TO THE CLAIM.

11. **Escrow.** Product deliverables will be placed in the possession of Escrow Agent, with all fees and expenses to be paid by Distributor. Distributor, and Escrow Agent shall in good faith negotiate an agreement mutually agreeable to Supplier and Distributor which shall include provisions protecting the confidentiality and non-disclosure of the Product and shall provide for the terms regarding release of the Product.

12. **Publicity.** Both Supplier and Distributor shall agree on the content of any public statements regarding the Distribution Agreement.

13. **Assignment.** Neither party may assign this Agreement or any rights or obligations under this Agreement without the prior written consent of the other party, except to an Affiliate or a third party in connection with the sale of all or substantially all of the party's business related to this Agreement, whether by sale

CONFIDENTIAL INFORMATION OF
CROMOGEN BIOTECHNOLOGY AND EARTH SCIENCE TECH, INC.

of assets, sale of stock, merger or otherwise. Any attempted assignment in violation of the foregoing is null and void. This Agreement will be binding upon and inure to the benefit of any permitted assigns and successors. Cromogen Biotechnology may subcontract any of its obligations under this Agreement without the prior written consent of Distributor, provided that Cromogen Biotechnology is responsible for the actions of its subcontractor.

14. Indemnity by Distributor. Distributor shall indemnify and hold harmless Cromogen Biotechnology and its affiliates and suppliers, and their officers, directors, employees, agents, and contractors ("Cromogen Biotechnology Indemnitees") from and against all third party claims, actions, proceedings, liabilities, and damages, and all costs, fees, and expenses related thereto (including attorneys' fees, expert witness fees, and court costs) directly or indirectly arising out of, in connection with, from, or related to: (i) any of Distributor's actual or alleged acts or omissions arising out of Distributor's activities under this Agreement, including any claims asserted by Customers based on such acts or omissions; (ii) negligence or misconduct by Distributor or its employees or agents; (iii) violation of any applicable laws by Distributor; (iv) breach of any provision of this Agreement by Distributor; (v) Distributor's or Customers' use, misuse, or sale of the Product, including claims of infringement of third party's intellectual property rights based on the use of the Product, except to the extent that Supplier is obligated to indemnify Distributor under Section 22.

15. Governing Law and Venue. This Agreement and performance by the parties hereunder shall be construed in accordance with the laws of the State of New York, U.S.A., without regard to provisions on the conflicts of laws. Both parties submit to exclusive International Arbitration through JAMS International using UNCITRAL rules in New York, New York. U.N. Convention on International Sale of Goods shall not apply to this Agreement.

16. Force Majeure. Supplier shall not be in default by reason of any failure or delay in performance of its obligations if such failure or delay arises out of causes beyond the reasonable control (whether caused directly or indirectly) of Cromogen Biotechnology ("Force Majeure Event"). Force Majeure Event may include, but is not restricted to: Acts of God or of the public enemy; acts of government (including specifically but not exclusively any orders, rules, or regulations issued by any official or agency of any such government) in either its sovereign or contractual capacity; riots; fires; earthquake; floods; epidemics; quarantine restrictions; embargoes; strikes; labor difficulties; unusually severe weather; shortages in labor, fuel, materials and supplies; power failure; denial of service attacks; or any combination thereof. Cromogen Biotechnology will promptly notify Distributor of the Force Majeure Event and resume performance as soon as possible.

17. Waiver. All waivers must be in writing and signed by an authorized representative of the party to be charged. Any waiver or failure to enforce any provision of this Agreement on one occasion will not be deemed a waiver of any other provision or of such provision on any other occasion.

18. Severability. If any provision of this Agreement is unenforceable, such provision will be changed and interpreted to accomplish the objectives of such provision to the greatest extent possible under applicable law and the remaining provisions will continue in full force and effect.

19. Independent Contractors. This Agreement is not intended to establish any partnership, joint venture, employment, or other relationship between the parties except that of independent contractors.

20. Construction. The section headings in this Agreement are for convenience of reference only, will not be deemed to be a part of this Agreement, and will not be referred to in connection with the construction or interpretation of this Agreement. Any rule of construction to the effect that ambiguities are to be resolved against the drafting party will not be applied in the construction or interpretation of

CONFIDENTIAL INFORMATION OF CROMOGEN BIOTECHNOLOGY AND EARTH SCIENCE TECH, INC.

this Agreement. As used in this Agreement, the words "include" and "including," and variations thereof, will not be deemed to be terms of limitation, but rather will be deemed to be followed by the words "without limitation." All references in this Agreement to "Sections" are intended to refer to Sections of this Agreement.

21. **Equitable Relief.** Distributor agrees that any actual or threatened misuse or misappropriation of the Product would cause irreparable injury to Supplier and its suppliers for which no adequate remedy at law exists; therefore, Distributor agrees that in addition to all other remedies available to Supplier, equitable remedies, including without limitation injunctive relief and specific performance, without the requirement of posting a bond (where applicable), are appropriate remedies to redress any of the foregoing. Distributor agrees that the limit of damages thought from Supplier is limited to the amount payable to Supplier under this Agreement. Supplier shall recover any out-of-pocket expenses incurred in seeking and enforcing any equitable remedies, including, without limitation, any legal expenses, including court costs and attorney's fees.

22. **Entire Agreement.** This Agreement, including all exhibits attached hereto and documents referenced herein, constitutes the entire agreement between Cromogen Biotechnology and Earth Science Tech, Inc. with respect to the subject matter hereof and supersedes all previous communications, representations and agreements, whether oral or written, between Distributor and Supplier. This Agreement may not be modified, supplemented, qualified or interpreted except in writing signed by Distributor and Supplier.

23. **Confidential Information and Trade Secrets:** Both the Distributor and the Supplier recognize that Attachment A contains information that is confidential in nature and if disclosed to competitors will harm both the distributor and the supplier. Therefore both parties agree that Exhibit A should not include confidential pricing to be disclosed or included in any public filing. however, both parties further agree that if Exhibit A will be presented, if required, to certain governmental and/or regulatory bodies or if required to be disclosed to any third party by a court of competent jurisdiction .

IN WITNESS WHEREOF, the parties have caused their duly authorized representatives to execute this Agreement as of the Effective Date.

Cromogen Biotechnology Corporation

By:

Name: Michael Brubeck

Title:  CEO

Date:  June  ,2014

Earth Science Tech, Inc.

By:

Name:  Harvey Katz

Title:  President

Date:  June 5, 2014



CONFIDENTIAL INFORMATION OF
CROMOGEN BIOTECHNOLOGY AND EARTH SCIENCE TECH, INC.

## EXHIBIT A

### 1. The Product

CBD (Cannabidiol) rich Hemp Oil at concentrations ranging from 5% - 50% of CBD molecule.

### 2. Production Pricing

a.
b.
c.
d.
e.

### 3. Revenue Share & Pricing

a. A flat $0.07 rate per milligram of CBD molecule is due to Supplier from revenue generating events of the Distributor throughout the Agreement Term. All other revenue is allocated for the benefit of Distributor.

b. All deals managed by Distributor require a 50% down payment due from the Distributor to the Supplier and an Escrow managed 25% / 25% delivery release as stipulated in section 1.7 of the Agreement.

### 4. Purchase Order Terms

a. Supplier will deliver based on Distributors guidance: 5 Kilograms of pure CBD molecule in a hemp oil base at $0.07 per mg of pure CBD molecule. This hemp oil base will have a 5% to 50% concentration of pure CBD molecule (based on Distributors reasonable guidance) with 0.3% (three tenths of one percent) THC or less. Depending on distributor requirements taking into consideration formulation, encapsulation and go-to market product decisions. For clarification 20 kilograms of hemp oil base mixed with 5 kilograms of pure CBD molecule would equal 25 kilograms of CBD rich hemp oil at 25% concentration.

b. Supplier will secure biomass required to produce 5 kilograms of CBD molecule and if directed by the Distributor transfer ownership possession of said biomass to Distributor or any other independent third party agreed to and nominated by the Distributor and Supplier by June 15th. Together with ownership possession, SteepHill Labs or CW Analytical will provide test results authoring relevant cannabinoid count in biomass.

c. Supplier will process the biomass and deliver CBD rich hemp oil to Distributor based on product formulation, encapsulation and go-to market decisions.

d. A separate, final product delivery schedule will be agreed upon in tandem with biomass ownership transfer.



**CONFIDENTIAL INFORMATION OF CROMOGEN BIOTECHNOLOGY AND EARTH SCIENCE TECH, INC.**

CONFIDENTIAL INFORMATION OF
CROMOGEN BIOTECHNOLOGY AND EARTH SCIENCE TECH, INC.

**Steven Warm**

| | |
|---|---|
| From: | robert@collectivewellness.org on behalf of Robert Martin [robert@cwanalytical.com] |
| Sent: | Wednesday, September 17, 2014 2:56 PM |
| To: | SW@stevenwarm.com |
| Cc: | Emily R |
| Subject: | Re: FW: CW Analytical Reports |

Mr. Warm,

I have investigated the situation you brought forth about identical ID numbers with different sample names appearing on reports from my company, CW Analytical Laboratories, Inc. The sample ID CW26368 represents the analysis of a single sample. The client of record for this ID number requested in writing to our chief chemist to change the sample name on three separate occasions, **an activity outside of our established protocol.** Our chemist has since been reprimanded for his lack of insight and a full management review has taken place. My apologies to your client for the confusion caused by this event and suffice it to say it will never happen in my company again. If any additional information is needed regarding this event please do not hesitate to call. I am

yours very truly,

Robert

Robert W. Martin, Ph. D.
Co-founder and Chief Operating Officer
CW Analytical Laboratories
Oakland and San Francisco California
925-719-0463

*"Justice consists not in being neutral between right and wrong, but in finding out the right and upholding it, whenever found, against the wrong!" Theodore Roosevelt*

This message may contain confidential and/or privileged information. If you are not the addressee or authorized to receive this for the addressee, you must not use, copy, disclose, or take any action based on this message or any information herein. If you have received this message in error, please advise the sender immediately by reply e-mail and delete this message. Thank you for your cooperation.

On Tue, Sep 16, 2014 at 6:44 AM, Steven Warm <SW@stevenwarm.com> wrote:

Dorothy:

Please find the certificates we have on this and let me see them, after which I will forward to Dr. Martin.

SW

EXHIBIT B

1

# CERTIFICATE OF ANALYSIS



**Sample ID:** CW26368

Sample Information [1]

**Sample Name:** Earth Science Tech - Sample
**Strain:** Unknown
**Sample Type:** Oil
**Client:** slavik
**Moisture:** 0.00%
**Growing Condition:** Unknown
**Growing Medium:** Unknown
**Product Weight:** 0.00 grams
**Servings:** 1

**Sample Status:** Approved
**Submitted For:**

Microbiological Screening

Chemical Residue Screening

Cannabinoid Profiling

**Date Submitted:** Sunday, July 6, 2014
**Date Expected:** Wednesday, July 9, 2014

**Comments:** Thin dark amber oil. Musky, earthy odor.

Cannabinoid Profiling



|       | Percent | mg/g |
|-------|---------|------|
| THC*  |         | 0.9  |
| CBD*  | 5.9     | 58.9 |
| CBN   |         | 0.2  |
| THCV  |         | 0.0  |
| CBG   |         | 0.1  |
| CBC   |         | 0.0  |
| Total | 6.0     | 60.1 |

* CW reports *effective* THC & CBD which represents expected content under typical decarboxylation conditions.

Microbiological Screening

|                       | CFU | Status | Acceptable Limit |
|-----------------------|-----|--------|------------------|
| Aerobic Bacteria (APC)| 0   | PASS   | <100,000         |
| Mold Count            | 0   | PASS   | <10              |
| Yeast Count           | 0   | PASS   | <10              |
| Coliform Count        | NA  | NA     | <100             |
| Ecoli Count           | NA  | NA     | <10              |
| Pseudomonas Count     | NA  | NA     |                  |

Product within acceptable microbiological limits.

Chemical Residue Screening

Product passed target residue screening.

Tests completed and approved on 7/9/2014 _____

COMPOSITE EXHIBIT "B"

# CERTIFICATE OF ANALYSIS

Sample Information

**Sample Name: Earth Science Tech - Sample**
**Strain:**
**Sample Type:** Oil
**Client:**
**Moisture:** 0.00%
**Growing Condition:** Unknown
**Growing Medium:** Unknown
**Product Weight:** 0.00 grams
**Servings:** 1

**Sample Status:** Approved
**Submitted For:**

Microbiological Screening

Chemical Residue Screening

Cannabinoid Profiling

**Date Submitted:** Sunday, July 6, 2014
**Date Expected:** Wednesday, July 9, 2014

**Comments:** Thin dark amber oil. Musky, earthy odor

Cannabinoid Profiling

|  | Percent | mg/g |
|---|---|---|
| THC* |  | 0.9 |
| CBD* | 5.9 | 58.9 |
| CBN |  | 0.2 |
| THCV |  | 0.0 |
| CBG |  | 0.1 |
| CBC |  | 0.0 |
| Total | 6.0 | 60.1 |

* CW reports *effective* THC & CBD which
represents expected content under typical
decarboxylation conditions.

Microbiological Screening

|  | CFU | Status | Acceptable Limit |
|---|---|---|---|
| Aerobic Bacteria (APC) | 0 | PASS | <100,000 |
| Mold Count | 0 | PASS | <10 |
| Yeast Count | 0 | PASS | <10 |
| Coliform Count | NA | NA | <100 |
| Ecoli Count | NA | NA | <10 |
| Pseudomonas Count | NA | NA |  |

Product within acceptable microbiological limits

Chemical Residue Screening

Product passed target residue screening

# *Red River*

## Environmental Laboratory and Consulting Company

### Analytical Laboratory - Environmental Consulting - Permit Application and Compliance

# Certificate of Analysis

ODEQ ID # 9953

| | |
|---|---|
| To: WEI CHEN | |
| WEI CHEN | |
| 1305 NW 195TH STREET | |
| EDMOND, OK 73012 | |

Project #:

Project Name:

Date Received: 8/6/2014

Report Date: 8/26/2014

| Lab Number | Sample Identification | Date Sampled | Analysis Date | Time | Analyzed By | Parameter | Q | Results | Units | RL | SQL | Method | Batch |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 201406894 | IHOECBD-6-A | | 8/25/2014 | 15:06 | MY | CBD | | 4 44 | % | | | GCMS | 27755 |
| | | | | | | | | | | | | | 27730 |
| 201406894 | IHOECBD-6-A | | | | | PEST-OC-S | | | | | | | 27730 |
| | | | 8/21/2014 | 16:56 | MY | Alpha-BHC | < | 4 | mg/kg | 0.02 | 4 | EPA_8081 | 27730 |
| | | | 8/21/2014 | | MY | Beta-BHC | < | 4 | mg/kg | 0.02 | 4 | EPA_8081 | 27730 |
| | | | 8/21/2014 | | MY | Gamma-BHC | < | 4 | mg/kg | 0.02 | 4 | EPA_8081 | 27730 |
| | | | 8/21/2014 | | MY | Delta-BHC | < | 4 | mg/kg | 0.02 | 4 | EPA_8081 | 27730 |
| | | | 8/21/2014 | | MY | Heptachlor | < | 4 | mg/kg | 0.02 | 4 | EPA_8081 | 27730 |
| | | | 8/21/2014 | | MY | Aldrin | < | 4 | mg/kg | 0.02 | 4 | EPA_8081 | 27730 |
| | | | 8/21/2014 | | MY | Heptachlor Epoxide | < | 4 | mg/kg | 0.02 | 4 | EPA_8081 | 27730 |
| | | | 8/21/2014 | | MY | Chlordane | < | 4 | mg/kg | 0.02 | 4 | EPA_8081 | 27730 |
| | | | 8/21/2014 | | MY | Endosulfan I | < | 4 | mg/kg | 0.02 | 4 | EPA_8081 | 27730 |
| | | | 8/21/2014 | | MY | Dieldrin | < | 4 | mg/kg | 0.02 | 4 | EPA_8081 | 27730 |
| | | | 8/21/2014 | | MY | 4,4'-DDE | < | 4 | mg/kg | 0.02 | 4 | EPA_8081 | 27730 |
| | | | 8/21/2014 | | MY | Endrin | < | 4 | mg/kg | 0.02 | 4 | EPA_8081 | 27730 |
| | | | 8/21/2014 | | MY | Endosulfan II | < | 4 | mg/kg | 0.02 | 4 | EPA_8081 | 27730 |
| | | | 8/21/2014 | | MY | 4,4'-DDD | < | 4 | mg/kg | 0.02 | 4 | EPA_8081 | 27730 |
| | | | 8/21/2014 | | MY | Endrin Aldehyde | < | 4 | mg/kg | 0.02 | 4 | EPA_8081 | 27730 |
| | | | 8/21/2014 | | MY | Endosulfan Sulfate | < | 4 | mg/kg | 0.02 | 4 | EPA_8081 | 27730 |
| | | | 8/21/2014 | | MY | 4,4'-DDT | < | 4 | mg/kg | 0.02 | 4 | EPA_8081 | 27730 |
| | | | 8/21/2014 | | MY | Endrin Ketone | < | 4 | mg/kg | 0.02 | 4 | EPA_8081 | 27730 |

*Laboratory Authorized Signature*

8510 S. Western Ave., Suite 207, Oklahoma City, OK 73139

Phone: (405)-232-1966 or 1-800-USA-KNOW Fax: 405-235-8234 www.RedRiverELCC.com

## *Red River*

**Environmental Laboratory and Consulting Company**

Analytical Laboratory - Environmental Consulting - Permit Application and Compliance

## **Certificate of Analysis**

ODEQ ID # 9953

To:  WEI CHEN
WEI CHEN
1305 NW 195TH STREET
EDMOND, OK 73012

Project #
Project Name

Date Received  8/6/2014
Report Date  8/26/2014

| Lab Number | Sample Identification | Date Sampled | Analysis Date | Time | Analyzed By | Parameter | Q | Results | Units | RL | SQL | Method | Batch |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 201406894 | IHOECBD-6-A | | 8/21/2014 | | MY | Methoxyclor | < | 4 | mg/kg | 0.02 | 4 | EPA_8081 | 27730 |
| | | | 8/21/2014 | | MY | Toxaphene | < | 10 | mg/kg | 0.05 | 10 | EPA_8081 | 27730 |
| | | | 8/21/2014 | | MY | TCMX (Surr) | Q | Dil Out | % Rec. | 30 | 30 | EPA_8081 | 27730 |
| | | | 8/21/2014 | | MY | 1,2-dcbp (Surr) | Q | Dil Out | % Rec. | 25 | 25 | EPA_8081 | 27730 |
| | | | | | | | | | | | | | 27665 |
| 201406894 | IHOECBD-6-A | | | | | 8270-S | | | | | | | 27665 |
| | | | 8/15/2014 | 2:03 | MY | N-Nitrosodimethylamine | < | 2 | mg/kg | 0.005 | 2 | EPA_8270 | 27665 |
| | | | 8/15/2014 | | MY | Pyridine | < | 2 | mg/kg | 0.005 | 2 | EPA_8270 | 27665 |
| | | | 8/15/2014 | | MY | Phenol | < | 4 | mg/kg | 0.01 | 4 | EPA_8270 | 27665 |
| | | | 8/15/2014 | | MY | Aniline | < | 2 | mg/kg | 0.005 | 2 | EPA_8270 | 27665 |
| | | | 8/15/2014 | | MY | Bis(2-Chloroethyl)ether | < | 2 | mg/kg | 0.005 | 2 | EPA_8270 | 27665 |
| | | | 8/15/2014 | | MY | 2-Chlorophenol | < | 4 | mg/kg | 0.01 | 4 | EPA_8270 | 27665 |
| | | | 8/15/2014 | | MY | 1,3-Dichlorobenzene | < | 2 | mg/kg | 0.005 | 2 | EPA_8270 | 27665 |
| | | | 8/15/2014 | | MY | 1,4-Dichlorobenzene | < | 2 | mg/kg | 0.005 | 2 | EPA_8270 | 27665 |
| | | | 8/15/2014 | | MY | Benzyl Alcohol | < | 2 | mg/kg | 0.005 | 2 | EPA_8270 | 27665 |
| | | | 8/15/2014 | | MY | 1,2-Dichlorobenzene | < | 2 | mg/kg | 0.005 | 2 | EPA_8270 | 27665 |
| | | | 8/15/2014 | | MY | 2-Methylphenol | < | 2 | mg/kg | 0.005 | 2 | EPA_8270 | 27665 |
| | | | 8/15/2014 | | MY | Bis(2-Chloroisopropyl)eth | < | 2 | mg/kg | 0.005 | 2 | EPA_8270 | 27665 |
| | | | 8/15/2014 | | MY | 3,4-Methylphenols | < | 4 | mg/kg | 0.01 | 4 | EPA_8270 | 27665 |
| | | | 8/15/2014 | | MY | N-Nitrosodi-n-propylamin | < | 2 | mg/kg | 0.005 | 2 | EPA_8270 | 27665 |
| | | | 8/15/2014 | | MY | Hexachloroethane | < | 2 | mg/kg | 0.005 | 2 | EPA_8270 | 27665 |
| | | | 8/15/2014 | | MY | Nitrobenzene | < | 2 | mg/kg | 0.005 | 2 | EPA_8270 | 27665 |

*Erica Southwell*
Laboratory Authorized Signature

6510 S. Western Ave., Suite 207, Oklahoma City, OK 73139
Phone: (405)-232-1966 or 1-800-USA-KNOW Fax: 405-235-8234 www.RedRiverELCC.com

# *Red River*

## Environmental Laboratory and Consulting Company

Analytical Laboratory - Environmental Consulting - Permit Application and Compliance

## Certificate of Analysis

ODEQ ID # 9953

To: WEI CHEN
WEI CHEN
1305 NW 195TH STREET
EDMOND, OK 73012

Project #:

Project Name:

Date Received  8/6/2014

Report Date  8/26/2014

| Lab Number | Sample Identification | Date Sampled | Analysis Date | Time | Analyzed By | Parameter | Q | Results | Units | RL | SQL | Method | Batch |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 201406894 | IHOECBD-6-A | | 8/15/2014 | | MY | Isophorone | < | 2 | mg/kg | 0.005 | 2 | EPA_8270 | 27665 |
| | | | 8/15/2014 | | MY | 2,4-Dimethylphenol | < | 2 | mg/kg | 0.005 | 2 | EPA_8270 | 27665 |
| | | | 8/15/2014 | | MY | 2-Nitrophenol | < | 4 | mg/kg | 0.01 | 4 | EPA_8270 | 27665 |
| | | | 8/15/2014 | | MY | Benzoic Acid | < | 2 | mg/kg | 0.005 | 2 | EPA_8270 | 27665 |
| | | | 8/15/2014 | | MY | Bis(2-Chloroethoxy)meth | < | 2 | mg/kg | 0.005 | 2 | EPA_8270 | 27665 |
| | | | 8/15/2014 | | MY | 2,4-Dichlorophenol | < | 2 | mg/kg | 0.005 | 2 | EPA_8270 | 27665 |
| | | | 8/15/2014 | | MY | 1,2,4-Trichlorobenzene | < | 2 | mg/kg | 0.005 | 2 | EPA_8270 | 27665 |
| | | | 8/15/2014 | | MY | Naphthalene | < | 2 | mg/kg | 0.005 | 2 | EPA_8270 | 27665 |
| | | | 8/15/2014 | | MY | 4-Chloroaniline | < | 2 | mg/kg | 0.005 | 2 | EPA_8270 | 27665 |
| | | | 8/15/2014 | | MY | Hexachlorobutadiene | < | 2 | mg/kg | 0.005 | 2 | EPA_8270 | 27665 |
| | | | 8/15/2014 | | MY | 4-Chloro-3-Methylphenol | < | 2 | mg/kg | 0.005 | 2 | EPA_8270 | 27665 |
| | | | 8/15/2014 | | MY | 2-Methylnaphthalene | < | 2 | mg/kg | 0.005 | 2 | EPA_8270 | 27665 |
| | | | 8/15/2014 | | MY | Hexachlorocyclopentadie | < | 2 | mg/kg | 0.005 | 2 | EPA_8270 | 27665 |
| | | | 8/15/2014 | | MY | 2,4,6-Trichlorophenol | < | 2 | mg/kg | 0.005 | 2 | EPA_8270 | 27665 |
| | | | 8/15/2014 | | MY | 2,4,5-Trichlorophenol | < | 2 | mg/kg | 0.005 | 2 | EPA_8270 | 27665 |
| | | | 8/15/2014 | | MY | 2-Chloronaphthalene | < | 2 | mg/kg | 0.005 | 2 | EPA_8270 | 27665 |
| | | | 8/15/2014 | | MY | 2-Nitroaniline | < | 2 | mg/kg | 0.005 | 2 | EPA_8270 | 27665 |
| | | | 8/15/2014 | | MY | Dimethyl phthalate | < | 2 | mg/kg | 0.005 | 2 | EPA_8270 | 27665 |
| | | | 8/15/2014 | | MY | 2,6-Dinitrotoluene | < | 2 | mg/kg | 0.005 | 2 | EPA_8270 | 27665 |
| | | | 8/15/2014 | | MY | Acenaphthylene | < | 2 | mg/kg | 0.005 | 2 | EPA_8270 | 27665 |
| | | | 8/15/2014 | | MY | 3-Nitroaniline | < | 2 | mg/kg | 0.005 | 2 | EPA_8270 | 27665 |
| | | | 8/15/2014 | | MY | 2,4-Dinitrophenol | < | 2 | mg/kg | 0.005 | 2 | EPA_8270 | 27665 |



Laboratory Authorized Signature

6510 S. Western Ave., Suite 207, Oklahoma City, OK 73139

Phone: (405)-232-1966 or 1-800-USA-KNOW Fax: 405-235-6234 www.RedRiverELCC.com

## *Red River*

### Environmental Laboratory and Consulting Company

Analytical Laboratory - Environmental Consulting - Permit Application and Compliance

# Certificate of Analysis

**ODEQ ID # 9953**

To: WEI CHEN
WEI CHEN
1305 NW 195TH STREET
EDMOND, OK 73012

Project #:
Project Name:

Date Received: 8/6/2014
Report Date: 8/26/2014

| Lab Number | Sample Identification | Date Sampled | Analysis Date | Time | Analyzed By | Parameter | Q | Results | Units | RL | SQL | Method | Batch |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 201406894 | IHOECBD-6-A | | 8/15/2014 | | MY | Acenaphthene | < | 2 | mg/kg | 0.005 | 2 | EPA_8270 | 27665 |
| | | | 8/15/2014 | | MY | 4-Nitrophenol | < | 2 | mg/kg | 0.005 | 2 | EPA_8270 | 27665 |
| | | | 8/15/2014 | | MY | 2,4-Dinitrotoluene | < | 2 | mg/kg | 0.005 | 2 | EPA_8270 | 27665 |
| | | | 8/15/2014 | | MY | Dibenzofuran | < | 2 | mg/kg | 0.005 | 2 | EPA_8270 | 27665 |
| | | | 8/15/2014 | | MY | Diethyl phthalate | < | 2 | mg/kg | 0.005 | 2 | EPA_8270 | 27665 |
| | | | 8/15/2014 | | MY | 4-Chlorophenyl phenyl et | < | 2 | mg/kg | 0.005 | 2 | EPA_8270 | 27665 |
| | | | 8/15/2014 | | MY | 4-Nitroaniline | < | 2 | mg/kg | 0.005 | 2 | EPA_8270 | 27665 |
| | | | 8/15/2014 | | MY | Fluorene | < | 2 | mg/kg | 0.005 | 2 | EPA_8270 | 27665 |
| | | | 8/15/2014 | | MY | 4,6-Dinitro-2-Methylphen | < | 2 | mg/kg | 0.005 | 2 | EPA_8270 | 27665 |
| | | | 8/15/2014 | | MY | N-Nitrosodiphenylamine | < | 2 | mg/kg | 0.005 | 2 | EPA_8270 | 27665 |
| | | | 8/15/2014 | | MY | Azobenzene | < | 2 | mg/kg | 0.005 | 2 | EPA_8270 | 27665 |
| | | | 8/15/2014 | | MY | 4-Bromophenyl-Phenylet | < | 2 | mg/kg | 0.005 | 2 | EPA_8270 | 27665 |
| | | | 8/15/2014 | | MY | Hexachlorobenzene | < | 2 | mg/kg | 0.005 | 2 | EPA_8270 | 27665 |
| | | | 8/15/2014 | | MY | Pentachlorophenol | < | 2 | mg/kg | 0.005 | 2 | EPA_8270 | 27665 |
| | | | 8/15/2014 | | MY | Phenanthrene | < | 2 | mg/kg | 0.005 | 2 | EPA_8270 | 27665 |
| | | | 8/15/2014 | | MY | Anthracene | < | 2 | mg/kg | 0.005 | 2 | EPA_8270 | 27665 |
| | | | 8/15/2014 | | MY | Carbazole | < | 2 | mg/kg | 0.005 | 2 | EPA_8270 | 27665 |
| | | | 8/15/2014 | | MY | Di-n-butyl phthalate | < | 4 | mg/kg | 0.01 | 4 | EPA_8270 | 27665 |
| | | | 8/14/2014 | | MY | Fluoranthene | < | 2 | mg/kg | 0.005 | 2 | EPA_8270 | 27665 |
| | | | 8/14/2014 | | MY | Benzidine | < | 2 | mg/kg | 0.005 | 2 | EPA_8270 | 27665 |
| | | | 8/14/2014 | | MY | Pyrene | < | 2 | mg/kg | 0.005 | 2 | EPA_8270 | 27665 |
| | | | 8/14/2014 | | MY | Butylbenzylphthalate | < | 2 | mg/kg | 0.005 | 2 | EPA_8270 | 27665 |

*Laura Southwell*

Laboratory Authorized Signature

6510 S. Western Ave., Suite 207, Oklahoma City, OK 73139

Phone: (405)-232-1966 or 1-800-USA-KNOW Fax: 405-235-8234 www.RedRiverELCC.com

# *Red River*

## Environmental Laboratory and Consulting Company

Analytical Laboratory - Environmental Consulting - Permit Application and Compliance

## Certificate of Analysis

**ODEQ ID # 9953**

To:  WEI CHEN
     WEI CHEN
     1305 NW 195TH STREET
     EDMOND, OK 73012

Project #:

Project Name:

Date Received:  8/6/2014

Report Date:  8/26/2014

| Lab Number | Sample Identification | Date Sampled | Analysis Date | Time | Analyzed By | Parameter | Q | Results | Units | RL | SQL | Method | Batch |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 201406894 | IHOECBD-6-A | | 8/14/2014 | | MY | 3,3-Dichlorobenzidine | < | 2 | mg/kg | 0.005 | 2 | EPA_8270 | 27665 |
| | | | 8/14/2014 | | MY | Bis(2-Ethylhexyl)phthalat | < | 4 | mg/kg | 0.01 | 4 | EPA_8270 | 27665 |
| | | | 8/14/2014 | | MY | Benzo(a)anthracene | < | 2 | mg/kg | 0.005 | 2 | EPA_8270 | 27665 |
| | | | 8/15/2014 | | MY | Chrysene | < | 2 | mg/kg | 0.005 | 2 | EPA_8270 | 27665 |
| | | | 8/15/2014 | | MY | Di-n-octyl phthalate | < | 4 | mg/kg | 0.01 | 4 | EPA_8270 | 27665 |
| | | | 8/15/2014 | | MY | Benzo(b)fluoranthene | < | 2 | mg/kg | 0.005 | 2 | EPA_8270 | 27665 |
| | | | 8/15/2014 | | MY | Benzo(k)fluoranthene | < | 2 | mg/kg | 0.005 | 2 | EPA_8270 | 27665 |
| | | | 8/15/2014 | | MY | Benzo(a)pyrene | < | 2 | mg/kg | 0.005 | 2 | EPA_8270 | 27665 |
| | | | 8/15/2014 | | MY | Indeno(1,2,3-Cd)pyrene | < | 2 | mg/kg | 0.005 | 2 | EPA_8270 | 27665 |
| | | | 8/15/2014 | | MY | Dibenz(a,h)anthracene | < | 2 | mg/kg | 0.005 | 2 | EPA_8270 | 27665 |
| | | | 8/15/2014 | | MY | Benzo(g,h,i)perylene | < | 2 | mg/kg | 0.005 | 2 | EPA_8270 | 27665 |
| | | | 8/15/2014 | | MY | 2-FP (Surr) | Q | Dil Out | %Rec | 37 | 37 | EPA_8270 | 27665 |
| | | | 8/15/2014 | | MY | Phenol-d5 (Surr) | Q | Dil Out | %Rec | 40 | 40 | EPA_8270 | 27665 |
| | | | 8/15/2014 | | MY | NB-d5 (Surr) | Q | Dil Out | %Rec | 37 | 37 | EPA_8270 | 27665 |
| | | | 8/15/2014 | | MY | 2-FBP (Surr) | Q | Dil Out | %Rec | 43 | 43 | EPA_8270 | 27665 |
| | | | 8/15/2014 | | MY | 2,4,6-TBP (Surr) | Q | Dil Out | %Rec | 42 | 42 | EPA_8270 | 27665 |
| | | | 8/15/2014 | | MY | Terphenyl-d14 (Surr) | Q | Dil Out | %Rec | 32 | 32 | EPA_8270 | 27665 |

*Steve Southwell*

Laboratory Authorized Signature

# *Red River*

## Environmental Laboratory and Consulting Company

### Analytical Laboratory - Environmental Consulting - Permit Application and Compliance

## Certificate of Analysis

ODEQ ID # 9953

| To: | WEI CHEN | | | |
| | WEI CHEN | | | |
| | 1305 NW 195TH STREET | Project #: | Date Received | 8/6/2014 |
| | EDMOND, OK 73012 | Project Name: | Report Date | 8/26/2014 |

| Lab Number | Sample Identification | Date Sampled | Analysis Date | Time | Analyzed By | Parameter | Q | Results | Units | RL | SQL | Method | Batch |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|

Note:

RL = Reporting Limit.  SQL* = Sample Quantitation Level.

B = Analyte was detected in both the sample and associated blank.

OL2 = Subcontracted to ODEQ Lab #7211.

M = Matrix effect present

* When a sample contains a high concentration of either a target or non-target compound(s) or interference, it must be diluted.  SQL = Dilution factor x MDL.  Samples are disposed of 20 days after the sample is reported.

BDL = Analyte was analyzed for but not detected above RL.

J = Analyte was detected above the RL but below the POL

Q = Surrogate recovery fell outside acceptance limits

U = Analyte was analyed for but not detected above RL

*Laura Southwell*

Laboratory Authorized Signature



**CannLabs**
*Responsibility through testing*

W Arnold
4255 South Buckley Road
Suite 114
Aurora, CO 80013

Test ID: CO0115035
Sample: 17206
Type: Concentrate

Received: 09/26/2014
Approved: 09/30/2014
Expires: 11/29/2014

Technician: Joel Johnston
Approved by: vnb

## Potency Test Results

| Test | Weight % | Conc. | Limit |
|------|----------|-------|-------|
| CBD-V | <0.001 % | <0.01 mg/g | N/A |
| CBD-A | 1.12 % | 11.19 mg/g | N/A |
| CBG | <0.001 % | <0.01 mg/g | N/A |
| CBD | 1.24 % | 12.40 mg/g | N/A |
| THC-V | <0.001 % | <0.01 mg/g | N/A |
| CBN | <0.001 % | <0.01 mg/g | N/A |
| THC | <0.001 % | <0.01 mg/g | N/A |
| CBC | <0.001 % | <0.01 mg/g | N/A |
| THC-A | <0.001 % | <0.01 mg/g | N/A |
| Max THC | N/A | N/A | N/A |
| Max CBD | 2.22 % | 22.21 mg/g | N/A |
| Total Active | 1.24 % | 12.40 mg/g | N/A |
| Total | 2.36 % | 23.58 mg/g | N/A |

### Potency Chart



● CBD-V  ● CBD-A  ⊙ CBG   CBD   THC-V  ◉ CBN
  THC   CBC  ⊙ THC-A

All cannabinoids in their acid forms (those ending in "-A") can be converted to their non-acid forms through a process called decarboxylation when the sample is heated. The molecules lose mass through this process, and thus to find the total theoretical active cannabinoids you must multiply the acid forms by 87.7%.

For example, THC-A can be converted to active THC using the formula: THC-A x 0.877 = THC
And so the Max THC for the sample is: Max THC = (THC-A x 0.877) + THC

This method has been validated according to the principles of the International Conference on Harmonisation.

## Visual Inspection

Inspection Comments: None



## Lab Information

CannLabs, Inc
3888 E Mexico Ave, Suite B50
Denver, CO 80210

Phone: 303-309-0105
Fax: 720-398-5904

lab@cannlabs.com
www.cannlabs.com

This report and all information herein shall not be reproduced, except in its entirety, without the expressed consent of CannLabs. This report is for informational purposes only and should not be used to diagnose, treat or prevent any medical related symptoms. Due to many factors outside of CannLabs control, results vary. Results are only for the samples supplied to Cannlabs. The statements and results herein have not been approved or endorsed by the FDA.

Copyright © 2014 CannLabs

# Damages caused by Cromogen using their own figures.

## E-Mail July 6th

**Slavik Nenaydokh  <nenaydokh@gmail.com>**

Michael

Gentlemen,

A few points to reiterate after my second followup discussion with Chad tonight:

1. It is critical to understand the strategic importance of having favored nation status in accessing 70 kilograms of CBD molecule in hemp oil for the public markets.
2. Due to the infancy of the CBD market (where no single competitor has access to more then 10-20 kilos), a 70 kilo play is not only 'Market Moving', but 'Market Forming'
3. From a public market, PR and Marketing strategy standpoint, the fact is that EST has retail access to $7,000,000 to $15,400,000 (.10/mg to .22/mg) of inventory.  Use these numbers wisely. You are Cromogen's "Exclusive" distributor in OTC.  Ride this point in a sophisticated manner.
4. In other words, EST now holds the position of dictating to the mass consumer market of what they should pay per milligram, how they should dose, in what formats and whom they should purchase these products from.(MJNA did us all a great service in teaching the market that they should pay $0.22-26/mg for CBD, let's introduce a new price point shall we)
5. The debate of high concentration vs lower concentrations:
   - o The competitors we face have been cultivated in the medical marijuana space, and transferred their thought process to the industrial hemp space, while singing the same song that concentrations are more valuable for reasons that are incoherent. While getting high off THC, it does make sense to have higher concentrations, since its difficult to smoke larger volumes of THC heavy product.  But in CBD that is not the play at all.
   - o Our teams have leverage over the high concentrate crowd, in that we can SCALE and therefore flood the market with as much CBD molecule as we want.  While everyone else struggles with the high cost of concentrating the products, we become the staple of CBD and other cannabinoids for the mass markets.
   - o If you need a Pharmaceutical example, refer to GW Pharma, who is treating Multiple Sclerosis and Schizophrenia with only 2.5 milligrams of CBD per spray combined with some THC.  The maximum sprays to treat severe cases is "12" per day.  So, 12 sprays = 30 mg of CBD.  That means that at 5mg per capsule, a patient has to consume 6 caps or 6 teaspoons of oil per day to treat severe illness. This is what I call accessibility !
   - o Please review the titration schedule for GW Pharma's main product Sativex: http://www.medicines.org.uk/emc/medicine/23262
6. Lastly, we must act in a coordinated fashion and conclude the 1st PO in the upcoming few days, while making a significant bet on the remaining 64 kilograms.

EXHIBIT "D"

I will speak to you around noon your time

Best Regards,
Slavik Nenaydokh

P S The sample should be at your address around noon your time tomorrow. As I underlined to Chad, this is solely for your testing procedural education so you can fluently speak about the product and testing approach CW Analytical is an independent laboratory and will deliver the rest of the key results tomorrow for your review We have invested a significant amount of capital in the last two years with the laboratories in San Francisco and Oakland and are confident in their abilities to pass audits and regulatory requirem

# INVOICE

## ImpactUA, Inc

500 N. Rainbow Blvd. Ste. 300 A
Las Vegas, NV 89107

**DATE:** August 13, 2014
**INVOICE #** EST-1
**FOR:** *CBD Rich Hemp Oil*

**Bill To:**

Earth Science Tech Inc.
2255 Glades Rd Ste. 324A
Boca Raton, FL 33431

| DESCRIPTION | AMOUNT |
|---|---|
| **CBD Hemp Oil Shipment** | |
| 2.5KG of CBD molecule in hemp oil | 87,500.00 |
| | |
| | |
| **TOTAL** | $            87,500.00 |

Wire instructions to ImpactUA, Inc
Bank of America
Account: 501017660204
Routing: 026009593

**THANK YOU FOR YOUR BUSINESS!**



December 12, 2014

Steve Nenaydokh
428 Bally Way
Pacifica, CA 94044

Re: Documents received on your behalf

Dear Steve Nenaydokh:

Thank you for using LegalZoom to serve as your Registered Agent for ImpactUA Inc. We received the following document on your behalf and are forwarding it to you for review.

To ensure that we are always able to contact you and forward the documents we receive on your behalf, please update your address and phone number with us regularly.

If you have any questions please feel free to give us a call at 1-800-773-0888.


Thank You.


LegalZoom Registered Agent Division